IVIG is on allocation, therefore, whenever a new patient needs to get the drug, I have a very difficult time finding it... This very serious issue will, in the end, be a barrier to care, considering the cost/ reimbursement of the drug. This is very serious, and the one who will suffer the most for the decisions made by others will be the sick patient who needs IVIG. (Angie Brinegar, RN BSN OCN, Coastal Cancer Center, Myrtle Beach, SC)

245.    In 2006, supply shortages of Plasma-Derivative Protein Therapies led to a series of crises at the patient level. The CBER Product Shortages e-mail address received dozens of emails that year from hospitals, patients, doctors, and pharmacists unable to obtain sufficient supply.

246.    According to one such patient with common variable immune deficiency, "I just received a phone call from my pharmacy telling me they do not have the product and am not sure when they will receive any. IVIG keeps me alive. Once my levels get too low, I will get very sick with pneumonia and be put in the hospital. Please restore access to IVIG so I can be healthy and not be sick in the hospital!"

247.    Likewise, a mother of three children receiving IVIG for common variable immune deficiency wrote "to confirm the fact that there is indeed a shortage of IVIG" that threatened to put her children's lives in danger. "It is difficult enough to keep my kids out of the hospital with bacterial infections—let alone think what will happen if they miss their infusions due to a lack of IVIG."

248.    That year, patients and doctors, along with a bipartisan coalition of 55 members of Congress, asked the Secretary of HHS to declare IVIG shortages a public health emergency. The HHS Committee on Blood Safety and Availability joined this coalition in urging the Secretary to declare a public health emergency, stating "there is a worsening crisis in the availability of and access to IGIV products that is affecting and placing patients' lives at risk." It was Defendants' artificial supply restrictions that created the crisis and forced rationing of Plasma-Derivative Protein Therapies.

249.    In 2006, HHS investigated reports that patients were experiencing problems purchasing IGIV. HHS stated that "[m]anufacturers are currently allocating IGIV to their customers. Under this allocation system, most customers are expected to justify their current

⊛
LAW OFFICES
COTCHETT,
PITRE, &
MCCARTHY

IGIV use to the manufacturer to maintain and/or increase their allocations. In economic terms, current IGIV supplies are being rationed." HHS also noted that "[t]he existence of a secondary market with high IGIV prices combined with a manufacturer instituted allocation system for IGIV are symptomatic of a market in which demand exceeds supply." HHS concluded that a majority of hospitals surveyed could not purchase enough IGIV to meet all of their patient needs, and calculated that the shortfall of supply relative to demand was approximately 14%.

250.    The shortages penetrated every level of patient care. Participants across the industry reported supply shortages of Plasma-Derivative Protein Therapies. A representative from a GPO noted that "the market is certainly tight" and explained that distributors were forced "to manage inventories to the gram level."

251.    The supply shortages affected every geographic region the in the US market to different degrees; however, according to the IDF, patients and doctors in almost every state had reported inadequate IVIG access.

Evidence also suggests that hospitals and pharmacies experienced trouble obtaining sufficient supplies of albumin. According to an email from the American Society of Health Pharmacies to CBER Product Shortages, pharmacies in Virginia experienced an albumin shortage in 2006. An email from the University of Michigan Blood Bank and Transfusion Center to CBER Product Shortages expresses the frustration and confusion felt throughout the industry in the face of these shortages: "[w]e have a market shortage of human albumin . . . I am told this is a national problem, but I do not see anything on the CBER shortage web page. What is going on?" Hospitals in Arizona, Illinois, Indiana, North Carolina, and Tennessee similarly reported trouble obtaining sufficient amounts of albumin due to a supply shortage.

252.    The conspiracy caused extremely low supplies of Plasma-Derivative Protein Therapies that caused many patients to go without crucial life-saving therapy treatments. According to a survey of hospital pharmacies administered by the IDF in 2006, 32% of hospitals had turned away patients seeking Ig. Similarly, 57% of physicians surveyed reported that they had been unable to provide patients with adequate amounts of Ig during the first quarter of 2006.

1     According to the same survey, 100% of the distributors asked responded that they had been

2 unable to obtain extra Ig from manufacturers.

3         253.    As a result of Defendants' supply restrictions, patients were forced to go without

4 Plasma-Derivative Protein Therapies. Some patients reportedly suffered side effects from

5 alternative treatments and infections caused by delayed treatment. In some instances, patients

6 even reportedly died when they had to wait too long to receive treatment.

7         254.    The difficulties faced by patients experiencing IVIG access problems is perhaps

8 best summarized by one patient from Florida who, in a statement to the IDF, said "It's

9 disgusting. What do they expect us to do? Are we supposed to just get sicker and sicker until

10 we pass away?"

11         255.    Another patient from Missouri called the IDF, stating "I am an 81 year old

12 Medicare PID [primary immunodeficiency disorder] patient ... I am sick all the time, and am not

13 sure if I will be able to live long enough to get my next infusion. I had an infusion scheduled at

14 the hospital. As I was leaving for the hospital, they called to cancel my appointment. They told

15 me that they will not be able to infuse me."

16         256.    These are but two representative statements out of hundreds from patients who

17 contacted IDF to report problems obtaining Plasma-Derivative Protein Therapies.

18         257.    The artificially high prices also limited those treating indigent patients from

19 obtaining enough plasma therapies at reasonable rates. Consequently, Medicare patients and

20 those receiving medical care through other government assistance programs for the indigent

21 suffered from supply shortages of Plasma-Derivative Protein Therapies at a disproportionate

22 rate compared to privately insured patients. According to a survey conducted by the IDF, twice

23 as many Medicare patients as privately insured patients encountered problems obtaining Ig

24 between 2003 and 2006.

25         258.    Privately insured patients, however, were also impacted by the artificial supply

26 shortages. Many were denied treatment when supplies ran out. As stated by one distressed

27 father from Ohio after his son's appointment to receive IVIG was canceled, "my family is

28 covered by Anthem BCBS, which I thought was good insurance. How can something like this

LAW OFFICES
COTCHETT,
PITRE, &
McCARTHY

**CLASS ACTION COMPLAINT**                               

1   happen?" And, according to the IDF, 50% of private insurance companies paid at, or below, the

2   Medicaid rate for Plasma-Derivative Protein Therapies, forcing patients to pay the difference or

3   denying coverage altogether.

4   259.   Throughout the class period, Defendants also refused to sell Plasma-Derivative

5   Protein Therapies at federally mandated discounted prices. Hospitals serving disproportionate

6   numbers of Medicaid patients are entitled to front-end discounts on drugs under Section 340B of

7   the Public Health Service Act (created under Section 602 of the Veterans Health Care Act of

8   1992). Hospitals eligible for 340B discounts were routinely informed that there was insufficient

9   supply of Ig to fill orders. According to a survey of eligible hospitals conducted by the Public

10  Hospital Pharmacy Coalition, only 21.42% of responding hospitals had been able to obtain IGIV

11  at the discounted price – in other words, nearly 80% of eligible hospitals were denied access at

12  the discounted price. However, 68.22% of eligible hospitals had been able to fill orders at

13  prices higher than the discounted rate.

14  260.   SMMC has experienced similar difficulties in acquiring Plasma-Derivative

15  Protein Therapies at federally mandated discounted prices.

16  261.   The evidence presented herein makes it economically irrational for the

17  manufacturer Defendants individually, absent an agreement to manipulate supply, to have

18  reduced or steadfastly maintained their supply levels during the relevant time period even in

19  times of severe shortage. The rational reaction to this shortage by any firm would have been to

20  increase supply. CSL's and Baxter's mutual refusal to do so only makes economic sense in light

21  of Defendants' arrangement to collectively reduce or maintain supply in order protect artificially

22  high pricing.

23  **D.   Defendants' Conspiracy Caused Prices For Plasma Protein-Derivative Therapies
     To Artificially Rise**

24

25  262.   Defendants' conspiracy succeeded, causing Plaintiff and other Class members to

26  purchase Plasma-Derivative Protein Therapies at supracompetitive prices. Beginning as early as

27  July 1, 2003 and continuing through the present, prices for Plasma-Derivative Protein Therapies

28  stabilized and then consistently increased.

⊕
LAW OFFICES
COTCHETT,
PITRE, &
MCCARTHY

**CLASS ACTION COMPLAINT**                                                          61

263. According to an analyst presentation that Grifols gave on March 5, 2008, the average sales price for a gram of IVIG has increased from about $47.60 in 2005 to about $57 in 2009. The Grifols presentation stated that "IVIG, which remains the driver of the plasma derivatives market, has witnessed price increases since 2005, coinciding with increased demand related to product availability."

264. According to the same presentation, the average sales price for a gram of albumin has increased from about $1.25 in 2005 to about $2.20 in 2009. The presentation also reports that "average albumin prices have steadily increased since 2005 from U.S. $14 to around U.S. $35 per 12.5 g. vial at present."

265. A Talecris 2008 SEC filing similarly notes that "[p]rices for albumin have increased significantly since 2005 .... The average selling price in 2007 was $28.55, having grown at a CAGR [compound annual growth rate] of 35% since 2005, when the U.S. average selling price (ASP) was $15.58."

266. CSL's and Baxter's contemporaneous business reports corroborate these findings.

267. For example, CSL Limited reported in its October 2004 Annual General Meeting presentation: "IVIG -prices have been stable with upward pressure going forward; currently experiencing solid demand;" and "Albumin - prices stable after period of weakness; inventory oversupply reducing." In its October 2005 Annual General Meeting presentation, CSL Limited remarked that "U.S. IVIG pricing environment improving," and that with respect to CSL Behring, it is "managing plasma throughput to match: run down in inventory benefit; reduction of inventory levels; [and] demand." The Chairman's Address from the same 2005 meeting stated that "CSL Behring is well positioned to develop its global business through," among other things, "an effective balance between supply and demand." And in its October 2006 Annual General Meeting presentation, CSL Limited noted both the continuing "strong global demand for plasma therapies continues," and "plasma sector stability."

LAW OFFICES
COTCHETT,
PITRE, &
MCCARTHY

**CLASS ACTION COMPLAINT**

268. Defendants' conspiracy has caused supracompetitive pricing resulting in significant annual increases profits for CSL and Baxter, even as most other industries have experienced drastically lowered earnings in the face of the global economic crisis.

269. CSL experienced a post-tax net profit of $502 million for the half-year ended December 31, 2008, an increase of 44% from that same period the previous year. The report also notes that "[t]he global financial crisis has had little to no impact so far on sales of CSL's portfolio of life-saving therapies and essential vaccines .... [a]nd we anticipate broadly stable market conditions to continue."

270. CSL Behring's total sales revenue increased 33% to $1.8 billion compared with the same period the previous year, "with strong contributions from both core and specialty plasma products," according to the same March 2009 CSL report.

271. Baxter's BioScience revenue climbed 12% to $1.36 billion in 2008, largely due to sales of plasma-based hemophilia and immune disorder treatments, vaccines and biosurgery products. Due to the profit its BioScience unit has generated, one news article noted that "Baxter is one of a handful of stocks that have proven somewhat resistant to the global recession."

## VII. FTC INVESTIGATION

272. As discussed herein, CSL announced its proposed acquisition of rival Talecris in 2008. On March 27, 2009, the FTC authorized a lawsuit to block CSL Limited's proposed $3.1 billion acquisition of Talecris, charging that the deal would be illegal and substantially would reduce competition in the United States markets for Ig, albumin, Rho-D, and Alpha-1. The same day the FTC also sought a preliminary injunction in federal district court in the District of Columbia to stop the transaction pending completion of an administrative trial.

273. In a press release, Richard Feinstein, Director of the FTC's Bureau of Competition, stated that "[s]ubstantial consolidation has already occurred in the plasma protein industry, *and these highly concentrated markets are already exhibiting troubling signs of coordinated behavior*" (emphasis added).

274. The FTC observed, among other things, "troubling signs of coordinated behavior," including Defendants' statements made in reports and to the press, meetings made outside of trade association meetings, signaling output levels, product rationing, and other conspiratorial actions by Defendants indicative of anti-competitive conduct.

275. The FTC alleged that, "with the elimination of Talecris-the one firm that has consistently and significantly expanded output in the United States— *CSL and Baxter International, Inc. ("Baxter") would face no remaining significant obstacle in their efforts to coordinate and tighten supply conditions for the relevant products, to the great detriment of consumers"* (emphasis added).

276. The FTC also reported that language contained in documents of CSL and Baxter suggests a strong possibility of ongoing coordinated interaction between firms in the plasma industry. Evidence of transparency, interdependence, and signaling among firms is particularly relevant to the allegations in this matter. The language at issue bears on these very important points, and demonstrates how firms used specific key words to:

- suggest to each other that increasing the production of lifesaving drugs could hurt the firms' ability to reap the significant profits they all achieved during an extended period where demand exceeded supply for the key products;

- remind each other of how, during a period when supply increased, prices and profitability for the firms in the market dropped significantly; and

- encourage each other to only increase supply incrementally to keep pace with demand, not increase supply to the extent the firms actually compete with each other for market share.

277. The FTC also has noted that the "quoted language" in its complaint taken from the files of Baxter and CSL "is similar to language that in other instances has been found to be evidence supporting an illegal price fixing conspiracy. *See, e.g., In re High Fructose Corn Syrup Antitrust Litigation, 295 F.3d 651, 662* (7th Cir. 2002) (Posner, J.) (referring to competitor as a 'friendly competitor,' mentioning an 'understanding between the companies that . . . causes [them] not to ... make irrational decisions,' and querying whether competitors 'will play by the rules (discipline)' can all be evidence of an explicit agreement to fix prices)."

278.    The FTC has recognized that some of the language from the files of CSL and Baxter would cause them "embarrassment" and "could 'expose [CSL] to possible treble damages actions.'"

279.    Shortly after the filing of the FTC complaint, on June 8, 2009, CSL Limited and Talecris publicly announced that they would abandon their proposed merger. On June 15, 2009, the FTC and the two firms jointly filed a motion to dismiss the FTC's complaint on that basis, and on June 22, 2009, the FTC dismissed the complaint.

## VIII.  ANTITRUST VIOLATIONS

280.    Beginning at least as early as July 1, 2003, and continuing through the present, Defendants and their co-conspirators engaged in a continuing agreement, understanding and conspiracy in restraint of trade to restrict output to artificially raise, fix, maintain and/or stabilize the prices of Plasma-Derivative Protein Therapies in the United States.

281.    Based on the foregoing, and on information and belief, in formulating and effectuating the contract, combination or conspiracy, Defendants and their coconspirators engaged in anti-competitive activities, the purpose and effect of which were to restrict output and to artificially raise, fix, maintain, and/or stabilize the price of Plasma-Derivative Protein Therapies sold in the U.S. These activities included:

a.      Defendants participating in meetings, conversations and communications to discuss the supply and price of Plasma-Derivative Protein Therapies in the United States; and

b.      Defendants agreeing during those meetings, conversations and communications to restrict output and to charge prices at specified levels and otherwise to fix, raise, maintain or stabilize prices of Plasma-Derivative Protein Therapies sold in the United States.

282.    Defendants and their co-conspirators engaged in the activities described above for the purpose of effectuating the unlawful agreements described in the Complaint.

LAW OFFICES
COTCHETT,
PITRE, &
MCCARTHY

283.    Throughout the Class Period, Plaintiff and the other Class members purchased Plasma-Derivative Protein Therapies from Defendants (or their subsidiaries or controlled affiliates) or their co-conspirators at supracompetitive prices.

284.    Defendants also agreed to exchange information regarding output and production capacity that had the effect of restricting output and of fixing, raising, maintaining, or stabilizing the prices of Plasma-Derivative Protein Therapies.

285.    Defendants' contract, combination or conspiracy constitutes an unreasonable restraint of interstate trade and commerce in violation of the Antitrust and Unfair Competition Laws.

## IX.  EFFECTS OF THE CONSPIRACY

286.    As a result of Defendants' unlawful conduct, Plaintiff and the other Class members have been injured in their business and property because they have paid more for Plasma-Derivative Protein Therapies than they would have paid in a competitive market.

287.    Defendants' unlawful contract, combination or conspiracy has had at least the following effects:

    a.    price competition in the markets for Plasma-Derivative Protein Therapies has been artificially restrained;

    b.    prices for Plasma-Derivative Protein Therapies sold by Defendants have been raised, fixed, maintained, and/or stabilized at supracompetitive levels; and

    c.    purchasers of Plasma-Derivative Protein Therapies from Defendants have been deprived of the benefit of free and open competition in the Plasma-Derivative Protein Therapies markets; and

    d.    Plaintiff and members of the Class have suffered financial injuries as a result.

## X.  FRAUDULENT CONCEALMENT

288.    Plaintiff and members of the Class did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until May 27, 2009, when the FTC's redacted complaint was filed.

LAW OFFICES
COTCHETT,
PITRE, &
McCARTHY

289.    Because Defendants' alleged conspiracy was kept secret until May 27, 2009, Plaintiff and members of the Class before that time were unaware of Defendants' unlawful conduct alleged herein, and they did not know before that time that they were paying supra-competitive prices for Plasma-Derivative Protein Therapies throughout the United States during the Class Period.

290.    The affirmative acts of the Defendants alleged herein, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection.

291.    By its very nature, Defendants' conspiracy was inherently self-concealing. Plasma-Derivative Protein Therapies are not exempt from antitrust regulation, and thus, before May 27, 2009, Plaintiff reasonably considered the plasma-derivative protein therapy industry to be a well-regulated, competitive industry.

292.    In addition, as detailed previously, Defendants, through their trade association, the PPTA, intentionally over-reported the supply of Plasma-Derivative Protein Therapies to the marketplace during the class period in order to avoid governmental and public scrutiny of their sales and marketing practices, and to conceal the existence of the shortages created by their conspiracy.

293.    Under the circumstances surrounding Defendants' pricing practices, Defendants' acts of concealment were more than sufficient to preclude suspicion by a reasonable person that Defendants' pricing was conspiratorial.  Accordingly, a reasonable person under the circumstances would not have been alerted to investigate the legitimacy of Defendants' Plasma-Derivative Protein Therapies prices before May 27, 2009.

294.    Plaintiff and members of the Class could not have discovered the alleged conspiracy at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by Defendants and their coconspirators to avoid detection of and fraudulently conceal their conspiracy.

295.    Because the alleged conspiracy was both self-concealing and affirmatively concealed by Defendants and their co-conspirators, Plaintiff and members of the Class had no

1  knowledge of the alleged conspiracy, or of any facts or information that would have caused a

2  reasonably diligent person to investigate whether a conspiracy existed, until May 27, 2009,

3  when the FTC complaint, and its corresponding factual allegations of anti-competitive conduct

4  concerning Plasma-Derivative Protein Therapies, were first publicly disseminated.

5       296.    None of the facts or information available to Plaintiff and members of the Class

6  prior to May 27, 2009, if investigated with reasonable diligence, could or would have led to the

7  discovery of the conspiracy alleged herein prior to that date.

8       297.    As a result of Defendants' fraudulent concealment of their conspiracy, any statute

9  of limitations has been tolled with respect to any claims that Plaintiff and members of the Class

10 have alleged in this Complaint.

11      298.    Defendants and their co-conspirators engaged in a successful anti-competitive

12 conspiracy concerning Plasma-Derivative Protein Therapies, which they affirmatively

13 concealed, at least in  the following respects:

14          a.      By communicating secretly to discuss output and prices of Plasma-Derivative

15                  Protein Therapies in the United States.

16          b.      By agreeing among themselves not to discuss publicly, or otherwise reveal, the

17                  nature and substance of the acts and communications in furtherance of their

18                  illegal scheme;

19          c.      By mis-reporting supply to HHS in order to conceal the dangerous shortages

20                  caused by their conspiracy;

21          d.      By falsely denying the existence of supply shortages for Plasma-Derivative

22                  Protein Therapies; and

23          e.      By "scrubbing" the minutes of the trade association meetings to remove

24                  references to anti-competitive discussions.

25      299.    As a result of Defendants' fraudulent concealment, all applicable statutes of

26 limitations affecting Plaintiff's and the Class' claims have been tolled.

27 //

28 //

LAW OFFICES
COTCHETT,
PITRE, &
McCARTHY

**CLASS ACTION COMPLAINT**                                                     68

# XI. **CLASS ACTION ALLEGATIONS**

300. Plaintiff brings this action on behalf of itself and as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the following class (the "Indirect Purchaser Class"):

> All persons and entities in the United States who purchased Plasma-Derivative Protein Therapies indirectly from any Defendant at any time from at least as early as July 1, 2003 through the present ("Class Period") and, which meet the definition of one or more of the Identified State Subclasses. Excluded from the Class are Defendants, their parent companies, subsidiaries and affiliates, any co-conspirators, federal governmental entities and instrumentalities of the federal government.

301. The Identified State Subclasses out of which the Indirect Purchaser Class is constituted, and on whose behalf Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, are defined as follows:

a) "Alabama State Subclass":

> All persons and entities in Alabama who purchased Plasma-Derivative Protein Therapies indirectly from any Defendant at any time from at least as early as July 1, 2003 through the present. Excluded from the Subclass are Defendants, their parent companies, subsidiaries and affiliates, any co-conspirators, federal governmental entities and instrumentalities of the federal government.

b) "Alaska State Subclass":

> All persons and entities in Alaska who purchased Plasma-Derivative Protein Therapies indirectly from any Defendant at any time from at least as early as July 1, 2003 through the present. Excluded from the Subclass are Defendants, their parent companies, subsidiaries and affiliates, any co-conspirators, federal governmental entities and instrumentalities of the federal government.

c) "Arizona State Subclass":

> All persons and entities in Arizona who purchased Plasma-Derivative Protein Therapies indirectly from any Defendant at any time from at least as early as July 1, 2003 through the present. Excluded from the Subclass are Defendants, their parent companies, subsidiaries and affiliates, any co-conspirators, federal governmental entities and instrumentalities of the federal government.

//

//

d) "California State Subclass":

All persons and entities in California who purchased Plasma-Derivative Protein Therapies indirectly from any Defendant at any time from at least as early as July 1, 2003 through the present. Excluded from the Subclass are Defendants, their parent companies, subsidiaries and affiliates, any co-conspirators, federal governmental entities and instrumentalities of the federal government.

e) "Colorado State Subclass":

All persons and entities in Colorado who purchased Plasma-Derivative Protein Therapies indirectly from any Defendant at any time from at least as early as July 1, 2003 through the present. Excluded from the Subclass are Defendants, their parent companies, subsidiaries and affiliates, any co-conspirators, federal governmental entities and instrumentalities of the federal government.

f) "District of Colombia Subclass":

All persons and entities in the District of Columbia who purchased Plasma-Derivative Protein Therapies indirectly from any Defendant at any time from at least as early as July 1, 2003 through the present. Excluded from the Subclass are Defendants, their parent companies, subsidiaries and affiliates, any co-conspirators, federal governmental entities and instrumentalities of the federal government.

g) "Florida State Subclass":

All persons and entities in Florida who purchased Plasma-Derivative Protein Therapies indirectly from any Defendant at any time from at least as early as July 1, 2003 through the present. Excluded from the Subclass are Defendants, their parent companies, subsidiaries and affiliates, any co-conspirators, federal governmental entities and instrumentalities of the federal government.

h) "Illinois State Subclass":

All persons and entities in Illinois who purchased Plasma-Derivative Protein Therapies indirectly from any Defendant at any time from at least as early as July 1, 2003 through the present. Excluded from the Subclass are Defendants, their parent companies, subsidiaries and affiliates, any co-conspirators, federal governmental entities and instrumentalities of the federal government.

I) "Iowa State Subclass":

All persons and entities in Iowa who purchased Plasma-Derivative Protein Therapies indirectly from any Defendant at any time from at least as early as July 1, 2003 through the present. Excluded from the Subclass are Defendants, their parent companies,

LAW OFFICES
COTCHETT,
PITRE, &
McCARTHY

subsidiaries and affiliates, any co-conspirators, federal
governmental entities and instrumentalities of the federal
government.

j) "Kansas State Subclass":

All persons and entities in Kansas who purchased
Plasma-Derivative Protein Therapies indirectly from any
Defendant at any time from at least as early as July 1, 2003
through the present. Excluded from the Subclass are Defendants,
their parent companies, subsidiaries and affiliates, any
co-conspirators, federal governmental entities and
instrumentalities of the federal government.

k) "Kentucky State Subclass":

All persons and entities in Kentucky who purchased
Plasma-Derivative Protein Therapies indirectly from any
Defendant at any time from at least as early as July 1, 2003
through the present. Excluded from the Subclass are Defendants,
their parent companies, subsidiaries and affiliates, any
co-conspirators, federal governmental entities and
instrumentalities of the federal government.

l) "Maine State Subclass":

All persons and entities in Maine who purchased
Plasma-Derivative Protein Therapies indirectly from any
Defendant at any time from at least as early as July 1, 2003
through the present. Excluded from the Subclass are Defendants,
their parent companies, subsidiaries and affiliates, any
co-conspirators, federal governmental entities and
instrumentalities of the federal government.

m) "Maryland State Subclass":

All persons and entities in Maryland who purchased
Plasma-Derivative Protein Therapies indirectly from any
Defendant at any time from at least as early as July 1, 2003
through the present. Excluded from the Subclass are Defendants,
their parent companies, subsidiaries and affiliates, any
co-conspirators, federal governmental entities and
instrumentalities of the federal government.

n) "Massachusetts State Subclass":

All persons and entities in Massachusetts who purchased
Plasma-Derivative Protein Therapies indirectly from any
Defendant at any time from at least as early as July 1, 2003
through the present. Excluded from the Subclass are Defendants,
their parent companies, subsidiaries and affiliates, any
co-conspirators, federal governmental entities and
instrumentalities of the federal government.

//

LAW OFFICES
COTCHETT,
PITRE, &
McCARTHY

CLASS ACTION COMPLAINT

1    o)    "Michigan State Subclass":

2          All persons and entities in Michigan who purchased
           Plasma-Derivative Protein Therapies indirectly from any
3          Defendant at any time from at least as early as July 1, 2003
           through the present. Excluded from the Subclass are Defendants,
4          their parent companies, subsidiaries and affiliates, any
           co-conspirators, federal governmental entities and
5          instrumentalities of the federal government.

6    p)    "Minnesota State Subclass":

7          All persons and entities in Minnesota who purchased
           Plasma-Derivative Protein Therapies indirectly from any
8          Defendant at any time from at least as early as July 1, 2003
           through the present. Excluded from the Subclass are Defendants,
9          their parent companies, subsidiaries and affiliates, any
           co-conspirators, federal governmental entities and
10         instrumentalities of the federal government.

11   q)    "Mississippi State Subclass":

12         All persons and entities in Mississippi who purchased
           Plasma-Derivative Protein Therapies indirectly from any
13         Defendant at any time from at least as early as July 1, 2003
           through the present. Excluded from the Subclass are Defendants,
14         their parent companies, subsidiaries and affiliates, any
           co-conspirators, federal governmental entities and
15         instrumentalities of the federal government.

16   r)    "Nebraska State Subclass":

17         All persons and entities in Nebraska who purchased
           Plasma-Derivative Protein Therapies indirectly from any
18         Defendant at any time from at least as early as July 1, 2003
           through the present. Excluded from the Subclass are Defendants,
19         their parent companies, subsidiaries and affiliates, any
           co-conspirators, federal governmental entities and
20         instrumentalities of the federal government.

21   s)    "Nevada State Subclass":

22         All persons and entities in Nevada who purchased
           Plasma-Derivative Protein Therapies indirectly from any
23         Defendant at any time from at least as early as July 1, 2003
           through the present. Excluded from the Subclass are Defendants,
24         their parent companies, subsidiaries and affiliates, any
           co-conspirators, federal governmental entities and
25         instrumentalities of the federal government.

26   t)    "New Mexico State Subclass":

27         All persons and entities in New Mexico who purchased
           Plasma-Derivative Protein Therapies indirectly from any
28         Defendant at any time from at least as early as July 1, 2003
           through the present. Excluded from the Subclass are Defendants,

1   their parent companies, subsidiaries and affiliates, any
2   co-conspirators, federal governmental entities and
    instrumentalities of the federal government.

3   u)   "New York State Subclass":

4        All persons and entities in New York who purchased
         Plasma-Derivative Protein Therapies indirectly from any
5        Defendant at any time from at least as early as July 1, 2003
         through the present. Excluded from the Subclass are Defendants,
6        their parent companies, subsidiaries and affiliates, any
         co-conspirators, federal governmental entities and
7        instrumentalities of the federal government.

8   v)   "North Carolina State Subclass":

9        All persons and entities in North Carolina who purchased
         Plasma-Derivative Protein Therapies indirectly from any
10       Defendant at any time from at least as early as July 1, 2003
         through the present. Excluded from the Subclass are Defendants,
11       their parent companies, subsidiaries and affiliates, any
         co-conspirators, federal governmental entities and
12       instrumentalities of the federal government.

13  w)   "North Dakota State Subclass":

14       All persons and entities in North Dakota who purchased
         Plasma-Derivative Protein Therapies indirectly from any
15       Defendant at any time from at least as early as July 1, 2003
         through the present. Excluded from the Subclass are Defendants,
16       their parent companies, subsidiaries and affiliates, any
         co-conspirators, federal governmental entities and
17       instrumentalities of the federal government.

18  x)   "Oregon State Subclass":

19       All persons and entities in Oregon who purchased
         Plasma-Derivative Protein Therapies indirectly from any
20       Defendant at any time from at least as early as July 1, 2003
         through the present. Excluded from the Subclass are Defendants,
21       their parent companies, subsidiaries and affiliates, any
         co-conspirators, federal governmental entities and
22       instrumentalities of the federal government.

23  y)   "South Dakota State Subclass":

24       All persons and entities in South Dakota who purchased
         Plasma-Derivative Protein Therapies indirectly from any
25       Defendant at any time from at least as early as July 1, 2003
         through the present. Excluded from the Subclass are Defendants,
26       their parent companies, subsidiaries and affiliates, any
         co-conspirators, federal governmental entities and
27       instrumentalities of the federal government.

28  //

LAW OFFICES
COTCHETT,
PITRE, &
McCARTHY

CLASS ACTION COMPLAINT                                              73

z)     "Utah State Subclass":

All persons and entities in Utah who purchased Plasma-Derivative Protein Therapies indirectly from any Defendant at any time from at least as early as July 1, 2003 through the present. Excluded from the Subclass are Defendants, their parent companies, subsidiaries and affiliates, any co-conspirators, federal governmental entities and instrumentalities of the federal government.

aa)    "Vermont State Subclass":

All persons and entities in Vermont who purchased Plasma-Derivative Protein Therapies indirectly from any Defendant at any time from at least as early as July 1, 2003 through the present. Excluded from the Subclass are Defendants, their parent companies, subsidiaries and affiliates, any co-conspirators, federal governmental entities and instrumentalities of the federal government.

bb)    "West Virginia State Subclass":

All persons and entities in West Virginia who purchased Plasma-Derivative Protein Therapies indirectly from any Defendant at any time from at least as early as July 1, 2003 through the present. Excluded from the Subclass are Defendants, their parent companies, subsidiaries and affiliates, any co-conspirators, federal governmental entities and instrumentalities of the federal government.

cc)    "Wisconsin State Subclass":

All persons and entities in Wisconsin who purchased Plasma-Derivative Protein Therapies indirectly from any Defendant at any time from at least as early as July 1, 2003 through the present. Excluded from the Subclass are Defendants, their parent companies, subsidiaries and affiliates, any co-conspirators, federal governmental entities and instrumentalities of the federal government.

dd)    "Wyoming State Subclass":

All persons and entities in Wyoming who purchased Plasma-Derivative Protein Therapies indirectly from any Defendant at any time from at least as early as July 1, 2003 through the present. Excluded from the Subclass are Defendants, their parent companies, subsidiaries and affiliates, any co-conspirators, federal governmental entities and instrumentalities of the federal government.

302.   Plaintiff believes that there are thousands of Class members located throughout the Identified States and in each Identified State, the exact number and their identities being

1  known by Defendants, making the Class and Subclasses so numerous and geographically
2  dispersed that joinder of all members is impracticable.

3      303.    Common questions of fact predominate in the claims of Class members,
4  including, but not limited to:

5      a.    Whether Defendants and their co-conspirators engaged in a combination and
6      conspiracy among themselves to restrict output and to fix, raise, maintain or
7      stabilize the prices of Plasma-Derivative Protein Therapies sold in the United
8      States;

9      b.    The identity of the conspiracy's participants;

10      c.    The duration of the conspiracy alleged in this Complaint and the acts carried out
11      by Defendants and their co-conspirators in furtherance of the conspiracy;

12      d.    Whether and the extent to which the conduct of Defendants and their co-
13      conspirators, as alleged in this Complaint, caused injury to the business and
14      property of Plaintiff and the other Class members;

15      e.    The effect of the conspiracy on the prices of Plasma-Derivative Protein Therapies
16      sold in the United States during the Class Period; and

17      f.    The appropriate Class-wide measure of damages.

18      304.    Common questions of law secondarily predominate in the claims of members of
19  each of the Identified State Subclasses, including, whether Defendants' conduct violated the
20  antitrust and/or unfair competition laws of the Identified State, and the appropriate Subclass-
21  wide measure of charges under such law.

22      305.    Plaintiff's claims are typical of the claims of Class members, and Plaintiff will
23  fairly and adequately protect the interests of the Class. Plaintiff and all members of the Class are
24  similarly affected by Defendants' wrongful conduct in violation of Antitrust And Unfair
25  Competition Laws in that they paid artificially inflated prices for products purchased indirectly
26  from Defendants or their co-conspirators. Plaintiff's claims arise out of the same common
27  course of conduct giving rise to the claims of the other Class members. Plaintiff's interests are
28  coincident with, and not antagonistic to, those of the other Class members.

LAW OFFICES
COTCHETT,
PITRE, &
MCCARTHY

**CLASS ACTION COMPLAINT**

306.    Plaintiff has retained competent counsel experienced in class action and complex antitrust and unfair competition litigation.

307.    The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants, result in substantial inefficiencies as well as un-pursued claims.

308.    A class action treatment is superior to other available methods for the fair and efficient adjudication of this controversy because:

a.    It will avoid a multiplicity of suits and consequent burden on the courts and Defendants;

b.    It would be virtually impossible for all members of the Class to intervene as parties-Plaintiff in this action;

c.    It will allow numerous persons with claims too small to adjudicate on an individual basis because of the prohibitive cost of this litigation, to obtain redress for their economic injuries;

d.    It is appropriate for treatment on a fluid recovery basis, which obviates any manageability problems; and

e.    It will provide court oversight of the claims process, once Defendants' liability is adjudicated.

309.    The Class and Subclasses are readily definable. Prosecution as a class action will eliminate the possibility of repetitious litigation. Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender. This action presents no difficulties in management that would preclude maintenance as a class action.

310.    This case is also appropriate for certification as a class action because the Defendants have acted and refused to act on grounds generally applicable to the Class, so that final injunctive relief will be appropriate with respect to the Class as a whole.

//



LAW OFFICES
COTCHETT,
PITRE, &
McCARTHY

**CLASS ACTION COMPLAINT**                                                              76

# XII. VIOLATIONS ALLEGED

## FIRST CLAIM FOR RELIEF

### (VIOLATION OF SECTION 1 OF THE SHERMAN ACT -15 U.S.C. § 1)

311. Plaintiff incorporates and re-alleges each allegation set forth in the preceding paragraphs of this Complaint.

312. Beginning at least as early as July 1, 2003, and continuing thereafter, Defendants and their co-conspirators, by and through their officers, directors, employees, agents, or other representatives, entered into a continuing agreement, understanding, and conspiracy in restraint of trade to restrict output and to artificially raise, fix, maintain, or stabilize prices for Plasma-Derivative Protein Therapies in the United States in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

313. Plaintiff and the other Class members have been injured in their business and property by reason of Defendants' unlawful combination, contract, conspiracy and agreement. Plaintiff and Class members have paid more for Plasma-Derivative Protein Therapies than they otherwise would have paid in the absence of Defendants' conduct. This injury is of the type the federal antitrust laws were designed to prevent and flows from that which makes Defendants' conduct unlawful.

314. Accordingly, Plaintiff and Class members seek injunctive relief as prayed for below, and costs of suit, including reasonable attorneys' fees.

## SECOND CLAIM FOR RELIEF

### (VIOLATION OF STATE ANTITRUST LAWS)

315. Plaintiff incorporates and re-alleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

316. Defendants created, operated, aided, or abetted a trust, combine, or monopoly of Plasma-Derivative Protein Therapies by fixing, controlling, or maintaining prices in violation of the state antitrust statutes listed below.

//

//

LAW OFFICES
COTCHETT,
PITRE, &
McCARTHY

**A.     Violation of Alabama Law, Ala. Code §§ 6-5-60 *et seq.***

317.     As set forth herein, Defendants created, operated, aided, or abetted a trust, combine, or monopoly of Plasma-Derivative Protein Therapies by fixing, controlling, or maintaining prices in violation of Ala. Code §§ 6-5-60 *et seq.* Defendants' unlawful conduct had the following effects: (1) the Plasma-Derivative Protein Therapies price competition and output were restrained, suppressed, and eliminated throughout Alabama; (2) the price of Plasma-Derivative Protein Therapies was raised, fixed, maintained, and stabilized at artificially high levels throughout Alabama; (3) Alabama State Subclass members were deprived of free and open competition; (4) Alabama State Subclass members relied on Defendants' false representation that the price of Plasma-Derivative Protein Therapies was a product of a free and fair market; and (5) Alabama State Subclass members paid supracompetitive, artificially inflated prices for Plasma-Derivative Protein Therapies.

318.     Defendants conspired to fix the prices for the Plasma-Derivative Protein Therapies. Defendants agreed not to divulge the existence of the conspiracy, conducted meetings and conversations in secret, confined the plan to a small group of high-level officials, and avoided the creation of documents. United by their common interests, Defendants colluded to substantially limit, lessen, and exclude competition. Defendants reduced the production of Plasma-Derivative Protein Therapies, which prevented and restrained trade and commerce. With the ability to preclude free and unrestricted competition, Defendants increased the price of Plasma-Derivative Protein Therapies.

319.     Alabama State Subclass members suffered an ascertainable loss of money or property from the supracompetitive, artificially inflated prices.

320.     Defendants' conduct is a substantial factor of the Alabama State Subclass' loss. The loss was a direct and proximate result of Defendants' willful price-fixing conspiracy. Alabama State Subclass members purchased Plasma-Derivative Protein Therapies at supracompetitive, artificially inflated prices because Defendants created fixed prices after Defendants precluded free and unrestricted competition.

//



LAW OFFICES
COTCHETT,
PITRE, &
MCCARTHY

**CLASS ACTION COMPLAINT**                                                            78

321.     Defendants created, operated, aided, or abetted a trust of Plasma-Derivative Protein Therapies by fixing, controlling, or maintaining prices in violation of Ala. Code §§ 6-5-60 *et seq.*, and Alabama State Subclass members, accordingly, seek damages and injunctive relief pursuant to Ala. Code § 6-5-60.

**B.     Violation of Alaska Law, AS §§ 45.50.562 *et seq.***

322.     As set forth herein, Defendants created, operated, aided, or abetted a trust, combine, or monopoly of Plasma-Derivative Protein Therapies by fixing, controlling, or maintaining prices in violation of AS §§ 45.50.562 *et seq.*  Defendants' unlawful conduct had the following effects: (1) the Plasma-Derivative Protein Therapies price competition and output were restrained, suppressed, and eliminated throughout Alaska; (2) the price of Plasma-Derivative Protein Therapies was raised, fixed, maintained, and stabilized at artificially high levels throughout Alaska; (3) Alaska State Subclass members were deprived of free and open competition; (4) Alaska State Subclass members relied on Defendants' false representation that the price of Plasma-Derivative Protein Therapies was a product of a free and fair market; and (5) Alaska State Subclass members paid supracompetitive, artificially inflated prices for Plasma-Derivative Protein Therapies.

323.     Defendants conspired fix the prices for Plasma-Derivative Protein Therapies. Defendants agreed not to divulge the existence of the conspiracy, conducted meetings and conversations in secret, confined the plan to a small group of high-level officials, and avoided the creation of documents.  United by their common interests, Defendants colluded to substantially limit, lessen, and exclude competition.  Defendants reduced the production of Plasma-Derivative Protein Therapies, which prevented and restrained trade and commerce. With the ability to preclude free and unrestricted competition, Defendants increased the price of Plasma-Derivative Protein Therapies.

324.     Alaska State Subclass members suffered an ascertainable loss of money or property from the supracompetitive, artificially inflated prices.

325.     Defendants' conduct is a substantial factor of the Alaska State Subclass' loss. The loss was a direct and proximate result of Defendants' willful price-fixing conspiracy. Alaska State Subclass members purchased Plasma-Derivative Protein Therapies at supracompetitive, artificially inflated prices because Defendants fixed prices after Defendants precluded free and unrestricted competition.

326.     Defendants created, operated, aided, or abetted a trust with the purpose of fixing, controlling, or maintaining prices of Plasma-Derivative Protein Therapies in violation of AS §§ 45.50.562 *et seq.*, and Alaska State Subclass members, accordingly, seek damages and injunctive relief pursuant to AS § 45.50.576.

## C.     Violation of the Arizona Uniform State Antitrust Act, A.R.S. §§ 44-1401 *et seq.*

327.     As set forth herein, Defendants created, operated, aided, or abetted a trust, combine, or monopoly of Plasma-Derivative Protein Therapies by fixing, controlling, or maintaining prices in violation of the Arizona Uniform State Antitrust Act, A.R.S. §§ 44-1401 *et seq.* Defendants' unlawful conduct had the following effects: (1) the Plasma-Derivative Protein Therapies price competition and output were restrained, suppressed, and eliminated throughout Arizona; (2) the price of Plasma-Derivative Protein Therapies was raised, fixed, maintained, and stabilized at artificially high levels throughout Arizona; (3) Arizona State Subclass members were deprived of free and open competition; (4) Arizona State Subclass members relied on Defendants' false representation that the price of Plasma-Derivative Protein Therapies was a product of a free and fair market; and (5) Arizona State Subclass members paid supracompetitive, artificially inflated prices for Plasma-Derivative Protein Therapies.

328.     Defendants conspired to fix the prices the Plasma-Derivative Protein Therapies. Defendants agreed not to divulge the existence of the conspiracy, conducted meetings and conversations in secret, confined the plan to a small group of high-level officials, and avoided the creation of documents.  United by their common interests, Defendants colluded to substantially limit, lessen, and exclude competition.  Defendants reduced the production of Plasma-Derivative Protein Therapies, which prevented and restrained trade and commerce.



LAW OFFICES
COTCHETT,
PITRE, &
MCCARTHY

1   With the ability to preclude free and unrestricted competition, Defendants increased the price of

2   Plasma-Derivative Protein Therapies.

3       329.    Arizona State Subclass members suffered an ascertainable loss of money or

4   property from the supracompetitive, artificially inflated prices.

5       330.    Defendants' conduct is a substantial factor of the Arizona State Subclass' loss.

6   The loss was a direct and proximate result of Defendants' willful price-fixing conspiracy.

7   Arizona State Subclass members purchased Plasma-Derivative Protein Therapies at

8   supracompetitive, artificially inflated prices because Defendants fixed prices after Defendants

9   precluded free and unrestricted competition.

10       331.    Defendants created, operated, aided, or abetted a trust with the purpose of fixing,

11   controlling, or maintaining prices of Plasma-Derivative Protein Therapies in violation of the

12   Arizona Uniform State Antitrust Act, A.R.S. §§ 44-1401 *et seq*., and Arizona State Subclass

13   members, accordingly, seek damages and injunctive relief pursuant to A.R.S. § 44-1408.

14   **D.**    **Violation of the California Cartwright Act, Cal. Bus. & Prof. Code §§ 16700 *et seq*.**

15       332.    As set forth herein, Defendants created, operated, aided, or abetted a trust,

16   combine, or monopoly of Plasma-Derivative Protein Therapies by fixing, controlling, or

17   maintaining prices in violation of the California Cartwright Act, Cal. Bus. & Prof. Code §§

18   16700 *et seq*.  Defendants' unlawful conduct had the following effects: (1) the

19   Plasma-Derivative Protein Therapies price competition and output were restrained, suppressed,

20   and eliminated throughout California; (2) the price of Plasma-Derivative Protein Therapies was

21   raised, fixed, maintained, and stabilized at artificially high levels throughout California; (3)

22   California State Subclass members were deprived of free and open competition; (4) California

23   State Subclass members relied on Defendants' false representation that the price of Plasma-

24   Derivative Protein Therapies was a product of a free and fair market; and (5) California State

25   Subclass members paid supracompetitive, artificially inflated prices for Plasma-Derivative

26   Protein Therapies.

27

28   //

**CLASS ACTION COMPLAINT**                             81

333.    Defendants conspired to fix the prices for the Plasma-Derivative Protein Therapies.  Defendants agreed not to divulge the existence of the conspiracy, conducted meetings and conversations in secret, confined the plan to a small group of high-level officials, and avoided the creation of documents.  United by their common interests, Defendants colluded to substantially limit, lessen, and exclude competition.  Defendants reduced the production of Plasma-Derivative Protein Therapies, which prevented and restrained trade and commerce. With the ability to preclude free and unrestricted competition, Defendants increased the price of Plasma-Derivative Protein Therapies.

334.    California State Subclass members suffered an ascertainable loss of money or property from the supracompetitive, artificially inflated prices.

335.    Defendants' conduct is a substantial factor of the California State Subclass' loss. The loss was a direct and proximate result of Defendants' willful price-fixing conspiracy. California State Subclass members purchased Plasma-Derivative Protein Therapies at supracompetitive, artificially inflated prices because Defendants fixed prices after Defendants precluded free and unrestricted competition.

336.    Defendants created, operated, aided, or abetted a trust with the purpose of fixing, controlling, or maintaining prices of Plasma-Derivative Protein Therapies, in violation of the California Cartwright Act, Cal. Bus. & Prof. Code §§ 16700, *et seq.*, and California State Subclass members, accordingly, seek damages and injunctive relief pursuant to Cal. Bus. & Prof. Code § 16750.

**E.    Violation of District of Columbia Law, DC Code §§ 28-4501 *et seq.***

337.    As set forth herein, Defendants created, operated, aided, or abetted a trust, combine, or monopoly of Plasma-Derivative Protein Therapies by fixing, controlling, or maintaining prices in violation of DC Code §§ 28-4501 *et seq.*  Defendants' unlawful conduct had the following effects: (1) the Plasma-Derivative Protein Therapies price competition and output were restrained, suppressed, and eliminated throughout the District of Columbia; (2) the price of Plasma-Derivative Protein Therapies was raised, fixed, maintained, and stabilized at artificially high levels throughout the District of Columbia; (3) District of Columbia Subclass

1  members were deprived of free and open competition; (4) District of Columbia Subclass

2  members relied on Defendants' false representation that the price of Plasma-Derivative Protein

3  Therapies was a product of a free and fair market; and (5) District of Columbia Subclass

4  members paid supracompetitive, artificially inflated prices for Plasma-Derivative Protein

5  Therapies.

6       338.    Defendants conspired to fix the prices of Plasma-Derivative Protein Therapies.

7  Defendants agreed not to divulge the existence of the conspiracy, conducted meetings and

8  conversations in secret, confined the plan to a small group of high-level officials, and avoided

9  the creation of documents. United by their common interests, Defendants colluded to

10  substantially limit, lessen, and exclude competition. Defendants reduced the production of

11  Plasma-Derivative Protein Therapies, which prevented and restrained trade and commerce.

12  With the ability to preclude free and unrestricted competition, Defendants increased the price of

13  Plasma-Derivative Protein Therapies.

14       339.    District of Columbia Subclass members suffered an ascertainable loss of money

15  or property from the supracompetitive, artificially inflated prices.

16       440.    Defendants' conduct is a substantial factor of the District of Columbia Subclass'

17  loss. The loss was a direct and proximate result of Defendants' willful monopoly and price-

18  fixing conspiracy. District of Columbia Subclass members purchased Plasma-Derivative

19  Protein Therapies at supracompetitive, artificially inflated prices because Defendants fixed

20  prices after Defendants precluded free and unrestricted competition.

21       441.    Defendants created, operated, aided, or abetted a trust with the purpose of fixing,

22  controlling, or maintaining prices of Plasma-Derivative Protein Therapies in violation of DC

23  Code §§ 28-4501 *et seq.*, and District of Columbia Subclass members, accordingly, seek

24  damages and injunctive relief pursuant to DC Code § 28-4508.

25  **F.**    **Violation of the Iowa Competition Law, I.C.A. §§ 553.1 *et seq.***

26       442.    As set forth herein, Defendants created, operated, aided, or abetted a trust,

27  combine, or monopoly of Plasma-Derivative Protein Therapies by fixing, controlling, or

28  maintaining prices in violation of the Iowa Competition Law, I.C.A. §§ 553.1 *et seq.*

LAW OFFICES
COTCHETT,
PITRE, &
MCCARTHY

**CLASS ACTION COMPLAINT**           83

1   Defendants' unlawful conduct had the following effects: (1) the Plasma-Derivative Protein

2   Therapies price competition and output were restrained, suppressed, and eliminated throughout

3   Iowa; (2) the price of Plasma-Derivative Protein Therapies was raised, fixed, maintained, and

4   stabilized at artificially high levels throughout Iowa; (3) Iowa State Subclass members were

5   deprived of free and open competition; (4) Iowa State Subclass members relied on Defendants'

6   false representation that the price of Plasma-Derivative Protein Therapies was a product of a

7   free and fair market; and (5) Iowa State Subclass members paid supracompetitive, artificially

8   inflated prices for Plasma-Derivative Protein Therapies.

9          443.    Defendants conspired to fix the prices for Plasma-Derivative Protein Therapies.

10  Defendants agreed not to divulge the existence of the conspiracy, conducted meetings and

11  conversations in secret, confined the plan to a small group of high-level officials, and avoided

12  the creation of documents.  United by their common interests, Defendants colluded to

13  substantially limit, lessen, and exclude competition.  Defendants reduced the production of

14  Plasma-Derivative Protein Therapies, which prevented and restrained trade and commerce.

15  With the ability to preclude free and unrestricted competition, Defendants increased the price of

16  Plasma-Derivative Protein Therapies.

17         444.    Iowa State Subclass members suffered an ascertainable loss of money or property

18  from the supracompetitive, artificially inflated prices.

19         445.    Defendants' conduct is a substantial factor of the Iowa State Subclass' loss.  The

20  loss was a direct and proximate result of Defendants' willful price-fixing conspiracy.  Iowa

21  State Subclass members purchased Plasma-Derivative Protein Therapies at supracompetitive,

22  artificially inflated prices because Defendants fixed prices after Defendants precluded free and

23  unrestricted competition.

24         446.    Defendants created, operated, aided, or abetted a trust of Plasma-Derivative

25  Protein Therapies by fixing, controlling, or maintaining prices in violation of the Iowa

26  Competition Law, I.C.A. §§ 553.1 *et seq.*, and Iowa State Subclass members, accordingly, seek

27  damages and injunctive relief pursuant to I.C.A. § 553.1.

28  //

LAW OFFICES
COTCHETT,
PITRE, &
MCCARTHY

**CLASS ACTION COMPLAINT**                                                                          84

**G.   Violation of Kansas Law, K.S.A. §§ 50-101 *et seq.*

447.    As set forth herein, Defendants created, operated, aided, or abetted a trust, combine, or monopoly of Plasma-Derivative Protein Therapies by fixing, controlling, or maintaining prices in violation of K.S.A. §§ 50-101 *et seq.* Defendants' unlawful conduct had the following effects: (1) the Plasma-Derivative Protein Therapies price competition and output were restrained, suppressed, and eliminated throughout Kansas; (2) the price of Plasma-Derivative Protein Therapies was raised, fixed, maintained, and stabilized at artificially high levels throughout Kansas; (3) Kansas State Subclass members were deprived of free and open competition; (4) Kansas State Subclass members relied on Defendants' false representation that the price of Plasma-Derivative Protein Therapies was a product of a free and fair market; and (5) Kansas State Subclass members paid supracompetitive, artificially inflated prices for Plasma-Derivative Protein Therapies.

448.    Defendants conspired to fix the prices of Plasma-Derivative Protein Therapies. Defendants agreed not to divulge the existence of the conspiracy, conducted meetings and conversations in secret, confined the plan to a small group of high-level officials, and avoided the creation of documents. United by their common interests, Defendants colluded to substantially limit, lessen, and exclude competition. Defendants reduced the production of Plasma-Derivative Protein Therapies, which prevented and restrained trade and commerce. With the ability to preclude free and unrestricted competition, Defendants increased the price of Plasma-Derivative Protein Therapies.

449.    Kansas State Subclass members suffered an ascertainable loss of money or property from the supracompetitive, artificially inflated prices.

450.    Defendants' conduct is a substantial factor of the Kansas State Subclass' loss. The loss was a direct and proximate result of Defendants' willful monopoly and price-fixing conspiracy. Iowa State Subclass members purchased Plasma-Derivative Protein Therapies at supracompetitive, artificially inflated prices because Defendants fixed prices after Defendants precluded free and unrestricted competition.

451.   Defendants created, operated, aided, or abetted a trust with the purpose of fixing, controlling, or maintaining prices of Plasma-Derivative Protein Therapies in violation of K.S.A. §§ 50-101 *et seq*., and Kansas State Subclass members, accordingly, seek damages and injunctive relief pursuant to K.S.A. § 50-161.

**H.     Violation of Maine Law, 10 M.R.S.A. §§ 1101 *et seq*.**

452.   As set forth herein, Defendants created, operated, aided, or abetted a trust, combine, or monopoly of Plasma-Derivative Protein Therapies by fixing, controlling, or maintaining prices in violation of 10 M.R.S.A. §§ 1101 *et seq*.  Defendants' unlawful conduct had the following effects: (1) the Plasma-Derivative Protein Therapies price competition and output were restrained, suppressed, and eliminated throughout Maine; (2) the price of Plasma-Derivative Protein Therapies was raised, fixed, maintained, and stabilized at artificially high levels throughout Maine; (3) Maine State Subclass members were deprived of free and open competition; (4) Maine State Subclass members relied on Defendants' false representation that the price of Plasma-Derivative Protein Therapies was a product of a free and fair market; and (5) Maine State Subclass members paid supracompetitive, artificially inflated prices for Plasma-Derivative Protein Therapies.

453.   Defendants conspired fix the prices of Plasma-Derivative Protein Therapies. Defendants agreed not to divulge the existence of the conspiracy, conducted meetings and conversations in secret, confined the plan to a small group of high-level officials, and avoided the creation of documents.  United by their common interests, Defendants colluded to substantially limit, lessen, and exclude competition.  Defendants reduced the production of Plasma-Derivative Protein Therapies, which prevented and restrained trade and commerce. With the ability to preclude free and unrestricted competition, Defendants increased the price of Plasma-Derivative Protein Therapies.

454.   Maine State Subclass members suffered an ascertainable loss of money or property from the supracompetitive, artificially inflated prices.

//

LAW OFFICES
COTCHETT,
PITRE, &
MCCARTHY

455. Defendants' conduct is a substantial factor of the Maine State Subclass' loss. The loss was a direct and proximate result of Defendants' willful monopoly and price-fixing conspiracy. Maine State Subclass members purchased Plasma-Derivative Protein Therapies at supracompetitive, artificially inflated prices because Defendants fixed prices after Defendants precluded free and unrestricted competition.

456. Defendants created, operated, aided, or abetted a trust with the purpose of fixing, controlling, or maintaining prices of Plasma-Derivative Protein Therapies in violation of 10 M.R.S.A. §§ 1101 *et seq.*, and Maine State Subclass members, accordingly, seek damages and injunctive relief pursuant to 10 M.R.S.A. § 1104.

## I. Violation of the Maryland Antitrust Act, MD Code Com. Law §§ 11-201 et seq.

457. As set forth herein, Defendants created, operated, aided, or abetted a trust, combine, or monopoly of Plasma-Derivative Protein Therapies by fixing, controlling, or maintaining prices in violation of the Maryland Antitrust Act, MD Code Com. Law §§ 11-201 *et seq.* Defendants' unlawful conduct had the following effects: (1) the Plasma-Derivative Protein Therapies price competition and output were restrained, suppressed, and eliminated throughout Maryland; (2) the price of Plasma-Derivative Protein Therapies was raised, fixed, maintained, and stabilized at artificially high levels throughout Maryland; (3) Maryland State Subclass members were deprived of free and open competition; (4) Maryland State Subclass members relied on Defendants' false representation that the price of Plasma-Derivative Protein Therapies was a product of a free and fair market; and (5) Maryland State Subclass members paid supracompetitive, artificially inflated prices for Plasma-Derivative Protein Therapies.

458. Defendants conspired to fix the prices of Plasma-Derivative Protein Therapies. Defendants agreed not to divulge the existence of the conspiracy, conducted meetings and conversations in secret, confined the plan to a small group of high-level officials, and avoided the creation of documents. United by their common interests, Defendants colluded to substantially limit, lessen, and exclude competition. Defendants reduced the production of Plasma-Derivative Protein Therapies, which prevented and restrained trade and commerce.

LAW OFFICES
COTCHETT,
PITRE, &
MCCARTHY

**CLASS ACTION COMPLAINT**

87

1  With the ability to preclude free and unrestricted competition, Defendants increased the price of

2  Plasma-Derivative Protein Therapies.

3      459.    Maryland State Subclass members suffered an ascertainable loss of money or

4  property from the supracompetitive, artificially inflated prices.

5      460.    Defendants' conduct is a substantial factor of the Maryland State Subclass' loss.

6  The loss was a direct and proximate result of Defendants' willful monopoly and price-fixing

7  conspiracy. Maryland State Subclass members purchased Plasma-Derivative Protein Therapies

8  at supracompetitive, artificially inflated prices because Defendants fixed prices after Defendants

9  precluded free and unrestricted competition.

10     461.    Defendants created, operated, aided, or abetted a trust with the purpose of fixing,

11 controlling, or maintaining prices of Plasma-Derivative Protein Therapies in violation of the

12 Maryland Antitrust Act, MD Code Com. Law §§ 11-201 *et seq.*, and Maryland State Subclass

13 members, accordingly, seek damages and injunctive relief pursuant to MD Code Com. Law §

14 11-209.

15 **J.    Violation of the Michigan Antitrust Reform Act, M.C.L.A. §§ 445.771 *et seq.***

16     462.    As set forth herein, Defendants created, operated, aided, or abetted a trust,

17 combine, or monopoly of Plasma-Derivative Protein Therapies by fixing, controlling, or

18 maintaining prices in violation of the Michigan Antitrust Reform Act, M.C.L.A. §§ 445.771 *et*

19 *seq.* Defendants' unlawful conduct had the following effects: (1) the Plasma-Derivative Protein

20 Therapies price competition and output were restrained, suppressed, and eliminated throughout

21 Michigan; (2) the price of Plasma-Derivative Protein Therapies was raised, fixed, maintained,

22 and stabilized at artificially high levels throughout Michigan; (3) Michigan State Subclass

23 members were deprived of free and open competition; (4) Michigan State Subclass members

24 relied on Defendants' false representation that the price of Plasma-Derivative Protein Therapies

25 was a product of a free and fair market; and (5) Michigan State Subclass members paid

26 supracompetitive, artificially inflated prices for Plasma-Derivative Protein Therapies.

27

28 //

LAW OFFICES
COTCHETT,
PITRE, &
McCARTHY

---

**CLASS ACTION COMPLAINT**                                                          88

463.    Defendants conspired to fix the prices of the Plasma-Derivative Protein Therapies.  Defendants agreed not to divulge the existence of the conspiracy, conducted meetings and conversations in secret, confined the plan to a small group of high-level officials, and avoided the creation of documents.  United by their common interests, Defendants colluded to substantially limit, lessen, and exclude competition.  Defendants reduced the production of Plasma-Derivative Protein Therapies, which prevented and restrained trade and commerce.  With the ability to preclude free and unrestricted competition, Defendants increased the price of Plasma-Derivative Protein Therapies.

464.    Michigan State Subclass members suffered an ascertainable loss of money or property from the supracompetitive, artificially inflated prices.

465.    Defendants' conduct is a substantial factor of the Michigan State Subclass' loss.  The loss was a direct and proximate result of Defendants' willful monopoly and price-fixing conspiracy.  Michigan State Subclass members purchased Plasma-Derivative Protein Therapies at supracompetitive, artificially inflated prices because Defendants fixed prices after Defendants precluded free and unrestricted competition.

466.    Defendants created, operated, aided, or abetted a trust with the purpose of fixing, controlling, or maintaining prices of  Plasma-Derivative Protein Therapies in violation of the Michigan Antitrust Reform Act, M.C.L.A. §§ 445.771 *et seq.*, and Michigan State Subclass members, accordingly, seek damages and injunctive relief pursuant to M.C.L.A. § 445.778.

**K.    Violation of the Minnesota Antitrust Law of 1971, M.S.A. §§ 325D.49 *et seq.***

467.    As set forth herein, Defendants created, operated, aided, or abetted a trust, combine, or monopoly of Plasma-Derivative Protein Therapies by fixing, controlling, or maintaining prices in violation of the Minnesota Antitrust Law of 1971, M.S.A. §§ 325D.49 *et seq.*  Defendants' unlawful conduct had the following effects: (1) the Plasma-Derivative Protein Therapies price competition and output were restrained, suppressed, and eliminated throughout Minnesota; (2) the price of Plasma-Derivative Protein Therapies was raised, fixed, maintained, and stabilized at artificially high levels throughout Minnesota; (3) Minnesota State Subclass members were deprived of free and open competition; (4) Minnesota State Subclass members

1    relied on Defendants' false representation that the price of Plasma-Derivative Protein Therapies

2    was a product of a free and fair market; and (5) Minnesota State Subclass members paid

3    supracompetitive, artificially inflated prices for Plasma-Derivative Protein Therapies.

4          468.    Defendants conspired to fix the prices of the Plasma-Derivative Protein

5    Therapies. Defendants agreed not to divulge the existence of the conspiracy, conducted

6    meetings and conversations in secret, confined the plan to a small group of high-level officials,

7    and avoided the creation of documents. United by their common interests, Defendants colluded

8    to substantially limit, lessen, and exclude competition. Defendants reduced the production of

9    Plasma-Derivative Protein Therapies, which prevented and restrained trade and commerce.

10    With the ability to preclude free and unrestricted competition, Defendants increased the price of

11    Plasma-Derivative Protein Therapies.

12          469.    Minnesota State Subclass members suffered an ascertainable loss of money or

13    property from the supracompetitive, artificially inflated prices.

14          470.    Defendants' conduct is a substantial factor of the Minnesota State Subclass' loss.

15    The loss was a direct and proximate result of Defendants' willful monopoly and price-fixing

16    conspiracy. Minnesota State Subclass members purchased Plasma-Derivative Protein Therapies

17    at supracompetitive, artificially inflated prices because Defendants fixed prices after Defendants

18    precluded free and unrestricted competition.

19          471.    Defendants created, operated, aided, or abetted a trust with the purpose of fixing,

20    controlling, or maintaining prices of Plasma-Derivative Protein Therapies in violation of the

21    Minnesota Antitrust Law of 1971, M.S.A. §§ 325D.49 *et seq.*, and Minnesota State Subclass

22    members, accordingly, seek damages pursuant to M.S.A. § 325D.57 and injunctive relief

23    pursuant to M.S.A. § 325D.58.

24    **L.**     **Violation of Mississippi Law, MS ST §§ 75-21-1 *et seq.***

25          472.    As set forth herein, Defendants created, operated, aided, or abetted a trust,

26    combine, or monopoly of Plasma-Derivative Protein Therapies by fixing, controlling, or

27    maintaining prices in violation of MS ST §§ 75-21-1 *et seq.* Defendants' unlawful conduct had

28    the following effects: (1) the Plasma-Derivative Protein Therapies price competition and output

LAW OFFICES
COTCHETT,
PITRE, &
MCCARTHY

**CLASS ACTION COMPLAINT**                              

1   were restrained, suppressed, and eliminated throughout Mississippi; (2) the price of

2   Plasma-Derivative Protein Therapies was raised, fixed, maintained, and stabilized at artificially

3   high levels throughout Mississippi; (3) Mississippi State Subclass members were deprived of

4   free and open competition; (4) Mississippi State Subclass members relied on Defendants' false

5   representation that the price of Plasma-Derivative Protein Therapies was a product of a free and

6   fair market; and (5) Mississippi State Subclass members paid supracompetitive, artificially

7   inflated prices for Plasma-Derivative Protein Therapies.

8       473.    Defendants conspired to fix the prices of Plasma-Derivative Protein Therapies.

9   Defendants agreed not to divulge the existence of the conspiracy, conducted meetings and

10  conversations in secret, confined the plan to a small group of high-level officials, and avoided

11  the creation of documents. United by their common interests, Defendants colluded to

12  substantially limit, lessen, and exclude competition. Defendants reduced the production of

13  Plasma-Derivative Protein Therapies, which prevented and restrained trade and commerce.

14  With the ability to preclude free and unrestricted competition, Defendants increased the price of

15  Plasma-Derivative Protein Therapies.

16      474.    Mississippi State Subclass members suffered an ascertainable loss of money or

17  property from the supracompetitive, artificially inflated prices.

18      475.    Defendants' conduct is a substantial factor of the Mississippi State Subclass'

19  loss. The loss was a direct and proximate result of Defendants' willful monopoly and price-

20  fixing conspiracy. Mississippi State Subclass members purchased Plasma-Derivative Protein

21  Therapies at supracompetitive, artificially inflated prices because Defendants fixed prices after

22  Defendants precluded free and unrestricted competition.

23      476.    Defendants created, operated, aided, or abetted a trust with the purpose of fixing,

24  controlling, or maintaining prices of Plasma-Derivative Protein Therapies in violation of MS ST

25  §§ 75-21-1 *et seq.*, and Mississippi State Subclass members, accordingly, seek damages

26  pursuant to MS ST §§ 75-21-9.

27

28  //

1    **M.    <u>Violation of Nebraska Law, Neb. Rev. St. §§ 59-801 *et seq.*</u>**

2        477.    As set forth herein, Defendants created, operated, aided, or abetted a trust,

3    combine, or monopoly of Plasma-Derivative Protein Therapies by fixing, controlling, or

4    maintaining prices in violation of Neb. Rev. St. §§ 59-801 *et seq.* Defendants' unlawful

5    conduct had the following effects: (1) the Plasma-Derivative Protein Therapies price

6    competition and output were restrained, suppressed, and eliminated throughout Nebraska; (2)

7    the price of Plasma-Derivative Protein Therapies was raised, fixed, maintained, and stabilized at

8    artificially high levels throughout Nebraska; (3) Nebraska State Subclass members were

9    deprived of free and open competition; (4) Nebraska State Subclass members relied on

10   Defendants' false representation that the price of Plasma-Derivative Protein Therapies was a

11   product of a free and fair market; and (5) Nebraska State Subclass members paid

12   supracompetitive, artificially inflated prices for Plasma-Derivative Protein Therapies.

13       478.    Defendants conspired to fix the prices of Plasma-Derivative Protein Therapies.

14   Defendants agreed not to divulge the existence of the conspiracy, conducted meetings and

15   conversations in secret, confined the plan to a small group of high-level officials, and avoided

16   the creation of documents. United by their common interests, Defendants colluded to

17   substantially limit, lessen, and exclude competition. Defendants reduced the production of

18   Plasma-Derivative Protein Therapies, which prevented and restrained trade and commerce.

19   With the ability to preclude free and unrestricted competition, Defendants increased the price of

20   Plasma-Derivative Protein Therapies.

21       479.    Nebraska State Subclass members suffered an ascertainable loss of money or

22   property from the supracompetitive, artificially inflated prices.

23       480.    Defendants' conduct is a substantial factor of the Nebraska State Subclass' loss.

24   The loss was a direct and proximate result of Defendants' willful monopoly and price-fixing

25   conspiracy. Nebraska State Subclass members purchased Plasma-Derivative Protein Therapies

26   at supracompetitive, artificially inflated prices because Defendants fixed prices after Defendants

27   precluded free and unrestricted competition.

28   //